730 F.2d 953
 James W. HUTCHINS, Appellant,
v.
James C. WOODARD, Secretary of Corrections of State of North
Carolina; Nathan Rice, Warden of Central Prison, Raleigh,
North Carolina; and Rufus L. Edmisten, Attorney General of
State of North Carolina, Appellees.
 No. 84-8050.
 United States Court of Appeals,
Fourth Circuit.
 Argued March 9, 1984.
Decided March 13, 1984.
 
 Roger W. Smith (Wade M. Smith, Douglas E. Kingsbery, J. Anthony Perry, Tharrington, Smith & Hargrove, Raleigh, N.C., on brief) for appellant.
 Jean A. Benoy, Deputy Atty. Gen., Raleigh, N.C. (Barry McNeill, Asst. Atty. Gen., Raleigh, N.C., on brief) for appellees.
 Before PHILLIPS, MURNAGHAN, and SPROUSE, Circuit Judges.
 MURNAGHAN, Circuit Judge:
 
 
 1
 We have to consider another of those heartrending cases in which a death sentence has been imposed and execution is imminent. As is all too customary, at the last, or nearly the last, moment, questions which counsel for the person condemned automatically classify as crucial are raised and advanced as grounds for a stay of execution to permit reasoned and unhurried consideration.
 
 
 2
 Judges regard themselves as merciful, and recognize that the quality of mercy should not be strained in so sympathetic a situation. Certainly, the situation merits description as crucial. We have, all too literally, to deal with a matter of life or death. At the same time, we as judges are charged with upholding and enforcing the law. We simply are not here persuaded that deferral of the punishment which, under the present condition of the law, the State is entitled to exact, is necessary or appropriate.
 
 
 3
 On September 21, 1979, a jury found James W. Hutchins guilty of first degree murder of two law enforcement officers and of second degree murder of a third such officer. On September 22, 1979, following a hearing as to whether or not the sentence should carry the death penalty in the case of the two convictions for first degree murder, the same jury[1] recommended imposition of a death sentence. In the selection process, five potential jurors had been successfully challenged for cause on the grounds that they could not under any circumstances vote to impose the death penalty.
 
 
 4
 Hutchins' direct appeal was unsuccessful, the North Carolina Supreme Court, on July 8, 1981, having filed its opinion affirming the conviction. State v. Hutchins, 303 N.C. 321, 279 S.E.2d 788 (1981). A motion for appropriate relief in the Superior Court of McDowell County, North Carolina, a writ of certiorari to the North Carolina Supreme Court, a federal habeas corpus proceeding initiated in the United States District Court for the Eastern District of North Carolina (but transferred to the United States District Court for the Western District of North Carolina), an appeal to this Court (Hutchins v. Garrison, 724 F.2d 1425 (4th Cir.1983)), and an application for stay of execution and petition for writ of certiorari to the Supreme Court of the United States (Hutchins v. Garrison, --- U.S. ----, 104 S.Ct. 750, 79 L.Ed.2d 207 (1984)) were all attempted on Hutchins' behalf. None was successful.
 
 
 5
 With execution fixed for January 13, 1984, one might have supposed that recourse to the courts was over. However, the supposition would be ill-founded. Zealous counsel on January 11, 1984 filed another motion for appropriate relief in the Superior Court of McDowell County. The motion asserted, as two of its grounds, new evidence, namely an opinion of a psychiatrist that Hutchins was insane then and now (i.e., then, when the crimes were committed so that his convictions were improper, and now, when execution was to occur, foreclosing the imposition of the sentence). Yet, the claim of insanity had been a prominent issue throughout the post-conviction court proceedings. We are content that the motion seeking appropriate relief on those grounds, raised at so late a date, and providing only the opinion of one more expert, pretty clearly constituted abuse of the writ, and certainly did not justify a determination that there was probable cause for success on Hutchins' part. Insanity vel non is not simply ascertained by head count of the experts, and the evidence that Hutchins was sane, then and now, was sufficient to put the matter to rest, immune from so late, and, in all probability, unnecessarily repetitive, attack on the convictions. We dismiss the petition insofar as those two related grounds are concerned since the district judge certainly did not exceed his discretionary powers in finding that the ensuing petition to a federal district court for a writ of habeas corpus constituted an abuse of the writ.[2] If called upon to do so, we should also deny a certificate of probable cause. See 28 U.S.C. Sec. 2253.
 
 
 6
 Neither at the trial, nor in any of the post-conviction proceedings through the time up to and including the action of the Supreme Court on January 11, 1984, however, was the third assertion contained in the January 11, 1984 motion for appropriate relief made: that Hutchins was unconstitutionally deprived of a fair trial because potential jurors who expressed a flat and unyielding opposition, by reason of conscientious objections, to imposition of the death penalty were systematically excluded (i.e., such an opposition was allowed as a grounds for striking for cause by the prosecution) from the jury that convicted Hutchins on September 21, 1979.[3]
 
 
 7
 That third ground which, judging from the course pursued at oral argument on March 9, 1984, appears to be the principal one relied on by Hutchins and his counsel, therefore, brings other considerations into play. To appreciate them requires us to turn to a recounting of further court developments. The motion for appropriate relief on January 11, 1984 was denied in the Superior Court on January 12, 1984, and, on the same day, review and a request for a stay of execution were denied by the North Carolina Supreme Court.
 
 
 8
 Next came the petition for a writ of habeas corpus and application for a stay of execution filed in the United States District Court for the Western District of North Carolina. The requested stay was denied on January 12, 1984 by that Court, without the merits of the petition being reached. Predictably, there followed an application to this Court. A single member of the Court, in the beginning hour of January 13, 1984 (execution having been set to occur at as early as 6:00 a.m. and no later than 6:00 p.m. on that day) granted a stay of execution to permit whatever consideration of the petition for a writ of habeas corpus was appropriate. That stay of execution, promptly appealed by the State of North Carolina to the Supreme Court of the United States, was vacated by the Supreme Court on the very same day, January 13, 1984. Woodard v. Hutchins, --- U.S. ----, 104 S.Ct. 752, 78 L.Ed.2d 541 (1984).[4]
 
 
 9
 Justice Powell, speaking for a majority of the Court, expressed, on January 13, 1984, the opinion that the petition, the denial of which we now review, was successive and constituted an abuse of the writ. He perceived no explanation for the failure earlier to raise the contentions relied on to support the petition of January 12, 1984, and succinctly concluded: "I see none." Justice Powell was of the unmistakable persuasion that "[a]ll three of Hutchins' claims could and should have been raised in his first petition for federal habeas corpus." He pointed out that there were some four years during which to develop psychiatric evidence and that there was no suggestion (which would have been implausible in any event) that the alleged insanity was of recent development. Justice Powell observed: "Finally, Hutchins does not explain why he failed to include his challenge to the jury selection in his prior habeas petition."
 
 
 10
 While the opinion of Justice Powell makes no specific reference to an opinion of Judge James B. McMillan in Keeten, et al. v. Garrison, 578 F.Supp. 1164 (W.D.N.C.1984), entered at approximately 7:00 p.m. on January 12, 1984, the decision manifestly was present before Justice Powell in view of the reference to the very case by Justice Brennan in his dissent from the decision of January 13, 1984 holding that the January 12, 1984 petition was an abuse of the writ. See --- U.S. ----, 104 S.Ct. 754-755, 78 L.Ed.2d 541 (1984):
 
 
 11
 Not only is there at least one other federal judge in Judge Phillips' own circuit who has ruled favorably on the merits of this question, see Avery v. Hamilton, [578 F.Supp. 1164] (WD NC 1984), and at least one District Court in Arkansas that has reached a similar conclusion, see Grigsby v. Mabry, 569 F.Supp. 1273 (ED Ark.1983), appeal pending, No. 83-2113 (CA8 filed Aug. 8, 1983), but also this Court itself has recognzied the potential validity of the claim. See, e.g., Witherspoon v. Illinois, 391 U.S. 510, 516-518 [88 S.Ct. 1770, 1774-1775, 20 L.Ed.2d 776] (1968); Bumper v. North Carolina, 391 U.S. 543, 545, and nn. 5-6 [88 S.Ct. 1788, 1789, and nn. 5-6, 20 L.Ed.2d 797] (1968).
 
 
 12
 The Avery decision is one of those jointly considered by Judge McMillan in his Keeten opinion.
 
 
 13
 In interpreting the significance of Justice Powell's decision of January 13, 1984, we must bear in mind that, on the subject of materiality or indicia of possible success, he was addressing not only the argument that the exclusion for cause of potential jurors unequivocally opposed to the death penalty resulted in trial before a non-representative jury during the guilt phase. Rather, he also took a stand, for the majority, in the awareness that two respected United States District Judges, one from the Western District of North Carolina, had given vitality to the argument through expressing themselves, in formal opinions, in a manner favorable to Hutchins' position. At the very minimum, therefore, Justice Powell had conferred upon the conviction and sentence a presumption of finality and legality. Barefoot v. Estelle, --- U.S. ----, ----, 103 S.Ct. 3383, 3390-91, 77 L.Ed.2d 1090 (1983).
 
 
 14
 As to the argument in and of itself, if the opinion of Judge McMillan is laid to one side, there are arguments, unanswerable as we view them, dooming to failure the attempt to obtain a writ of habeas corpus.
 
 
 15
 First, counsel for Hutchins freely admit that:
 
 
 16
 1) One of their number, Roger W. Smith, in two prior cases decided in 1979 had raised the very same argument without success.[5]
 
 
 17
 2) The sociological data on which Judge McMillan, and in large measure Judge Eisele in Grigsby v. Mabry, 569 F.Supp. 1273 (E.D.Ark.1983), appeal pending, 11th Cir. No. 83-2113, relied in coming to their conclusion that an unconstitutional trial takes place when, for the guilt phase, in a first degree murder case, potential jurors are excused for cause if unequivocally opposed to the death penalty was fully available to counsel for Hutchins no later than September, 1983, as part of the public record in the Keeten consolidated cases.[6] Since Judge Eisele had already issued his opinion in Grigsby v. Mabry, on August 5, 1983, the existence of the contention and the fact that it had secured the support of one federal district judge were matters of which Hutchins, through his counsel, was clearly chargeable with knowledge.
 
 
 18
 3) Indeed, insofar as the underlying sociological data is concerned, it considerably antedates 1983 in its availability to Hutchins, ranging in date from 1964 through 1968, 1970 (2 items), 1971, 1979 (4 items), 1980 (2 items) and 1981 (3 items).
 
 
 19
 Second, we, as a panel of the court, are bound to give controlling precedential effect to earlier decisions of the Court, absent a clear and sufficient reason not to do so. In Barfield v. Harris, 719 F.2d 58 (4th Cir.1983), the Court had before it the very contention relied on now by Hutchins and unequivocally ruled against the contention. In the opinion of the District Court, Barfield v. Harris, 540 F.Supp. 451 (E.D.N.C.1982), Chief Judge Franklin T. Dupree, Jr. specifically held against the contention that excusing for cause in a capital case of potential jurors who stated that they could under no circumstances vote to impose the death penalty violates a defendant's right to an impartial jury drawn from a representative cross-section of the community, and that the trial was fair and suffered no constitutional impediment.[7]
 
 
 20
 When Barfield v. Harris reached this Court, while the death qualified jury issue was specifically raised, the Court did not regard it as necessitating particular comment. It simply dealt with the contention in an all-embracing fashion, stating:
 
 
 21
 Numerous other contentions are advanced on Mrs. Barfield's behalf, but all of these other contentions were more than adequately handled by the district judge in his opinion, Barfield v. Harris, 540 F.Supp. 451 (E.D.N.C.1982). As to those contentions, we affirm for the reasons stated by the district judge.
 
 
 22
 719 F.2d at 63 (emphasis supplied).
 
 
 23
 Consequently, when all is said and done, the case comes down to whether the expression, by a single district judge within the Fourth Circuit, of an opinion favorable to Hutchins suffices for us to determine that from and after January 12, 1984 there has been sufficient unsettling of the law to justify the grant of a stay of execution to allow a whole new round of litigation. Such a determination would not coincide with the contrary view on the very issue expressed by a majority of the members of the Supreme Court. If the case were not one involving capital punishment, the answer would be easy. Hutchins and his counsel are too late.
 
 
 24
 At this point, Judge Phillips, Judge Sprouse, and the author of this opinion take somewhat different routes to the same end result. The separate concurring opinions of Judge Phillips and Judge Sprouse disclose their views. From here forward in the present opinion, the author will be speaking for himself alone, unless from the context it is clear that his views and those of his panel colleagues coincide. The author has no fault to find with what Judge Phillips and Judge Sprouse have each written. As a matter of legal logic, Judge Phillips and Judge Sprouse are on unassailable grounds.
 
 
 25
 For the author, however, there remains a difficulty. If Judge McMillan had, indeed, hit, through reference to sociological data, on a proposition of law which, in all probability, would carry the day, even though that would entail the overruling of practices uniformly dating back for centuries, the author cannot reconcile himself to the idea that Hutchins would be executed simply because of procedural complications, despite a revolutionary and valid new legal doctrine which, almost certainly, should save him. It being a death case, the author is disinclined to curtail the right to litigate on procedural grounds alone. Without being at all certain that we should proceed so far, he is prepared to say that we should inquire as to whether the argument is too little as well as too late.
 
 
 26
 The author would emphasize that he does not contemplate a full-scale exploration of the merits. He only would expand his inquiry to include the issue of whether the view expressed by Judge McMillan in Keeten enjoys a decided, substantial chance of success, with the Fourth Circuit or with the Supreme Court. That is the necessary step to determine whether there is probable cause, meriting a certificate under 28 U.S.C. Sec. 2253.
 
 
 27
 For at the same time, we must not ignore the interests of others, specifically Keeten, Avery and Williams, who have been permitted to appear as amici curiae and who argue for a stay in Hutchins to allow consideration of the sociological data contained in the record of the Keeten case. The Court questions the wisdom of their having done so, for it subjects them to the risk of being especially bound by the decision in the instant case. However, since the posture of their cases permits more leisurely review,[8] not entailing the rights of the state and the public to scrupulous adherence to the letter and spirit of the law as to exaction of legal punishment, the author explicitly phrases his expression on the likelihood of success of Hutchins in terms not intended, on a stare decisis or res judicata basis, to preclude counsel for Keeten, et al. from pursuing the issue on appeal. He makes that expression simply in the course of determining whether a certificate of probable cause should issue to allow Hutchins' appeal to go forward.
 
 
 28
 In short, it suffices to state that, in the author's view of the merits, limited by the short time allotted to us for consideration of the matter, but benefited by the full availability of the record in the Keeten case,[9] that there is little prospect of success at either the Circuit Court or the Supreme Court level for the propositions that:
 
 
 29
 1) Potential jurors may not be barred for cause from the guilt phase of a capital murder trial because they have a fixed, automatic, and unequivocal view opposing imposition of the death penalty, and
 
 
 30
 2) Consequently, North Carolina must, to make its procedure accord with constitutional standards, select a different jury to serve in the sentence phase of a capital case, after trial of the question of guilt by a jury from which those inflexibly opposed to the death penalty have not been excluded for that reason.
 
 
 31
 While Judge McMillan has written cogently and feelingly, the consideration necessarily remains that such a ruling would mandate a departure from a procedure dating back to the origins of the Republic and further back in England. Judge McMillan's view depends almost entirely on the proposition that current statistics establish that conviction in capital cases is more probable when potential jurors have been excluded for cause if possessed of an inflexible view that the death sentence should not be imposed, regardless of the details of the crime, or of the abundance of evidence of guilt. The step Judge McMillan has taken from that premise, however, does not necessarily follow.[10] The statistics do not to a logical certainty establish that, in cases where proof beyond a reasonable doubt is lacking, there is any greater likelihood that there will be a conviction because no juror is unalterably opposed to capital punishment. Indeed, it may be forcefully argued that the statistics merely indicate that concern over the possibility of capital punishment may so trouble a juror firmly opposed to the imposition of a death sentence that he or she will vote for acquittal despite overwhelming proof of guilt, in order to assuage conscientious misgivings that indirectly a vote of guilty would leave the defendant exposed to, and hence would amount to a vote for, the death penalty. To such behavior by a juror, Hutchins simply has no right. One of the studies comprising the Keeten sociological data identified the statistic as 18% for "persons who would be unwilling to impose the death penalty in any case ... stat[ing] that they would vote not guilty at the guilt phase of the trial, even if they believed the defendant to be guilty, in order to prevent the defendant from being executed." E. Bronson, Does the Exclusion of Scrupled Jurors in Capital Cases Make the Jury More Likely to Convict? Some Evidence from California, 3 Woodrow Wilson Law J. 11, 20 (1981).
 
 
 32
 The inescapable fact is that, at the present moment in time, imposition of the death penalty for certain offenses, proven in an acceptable manner, is constitutional.[11] A juror unalterably opposed to imposition of the death sentence, under the prevalent system by which the same jury first considers guilt, and, upon conviction, moves on to the question of which sentence to recommend, cannot comply with the duty which the law imposes. To permit such a potential juror to serve would be positively to deny the state its right to an impartial consideration of whether the death sentence should be recommended.
 
 
 33
 To hold that the jury concerned with guilt or innocence would be unrepresentative, if all prospective jurors inflexibly opposed to the death penalty were excludible for cause, essentially begs the question. A juror prejudiced or biased for any reason, upon exclusion for cause, renders a jury "unrepresentative" in that untenable sense. For example, over half the eligible jurors might, in a county where prejudice runs high, be unable to judge fairly in a case involving a plaintiff and a defendant of different races. A jury made up from the minority who would not be so biased would not be unrepresentative for constitutional purposes, even though more than 50% of the pool from which it would otherwise be drawn were excluded.
 
 
 34
 Having made those observations to indicate that it is as close to certain as humans are ever permitted to come that an appeal by Hutchins would not succeed, the author emphasizes that they concern solely the Hutchins case, in the posture it appears before us. The observations constitute merely an estimate of the success or lack thereof which is to be expected if a stay of execution should be granted to permit a hearing on the issues Hutchins wishes to appeal to take place. The author perceives no probable cause to believe Hutchins would prevail. In another case presenting different considerations, either factual in nature or constituting legal argument, the opportunity for distinguishing the present decision would not be foreclosed.
 
 
 35
 Accordingly, the Court declines to grant a certificate of probable cause to appeal in the case commenced by the petition for a writ of habeas corpus filed January 12, 1984. The petitioner simply has not made the requisite substantial showing of the denial of a federal right. See Barefoot v. Estelle, --- U.S. ----, ----, 103 S.Ct. 3383, 3394, 77 L.Ed.2d 1090 (1983). The application for a stay of execution is also denied.
 
 
 36
 JAMES DICKSON PHILLIPS, Circuit Judge, specially concurring.
 
 
 37
 I concur in the result, and in much of what Judge Murnaghan has written in the lead opinion for the court. I write only to emphasize my understanding of the narrowness of the issue before us and my concern that we should not express any opinion on the merits of the jury-selection issue beyond that absolutely required to dispose of the dispositive issue before us.*
 
 I.
 
 38
 The limited issue before us is revealed by considering the procedural path by which the case has now reached us. The Supreme Court's decision vacating the stay that I entered as a single circuit judge upheld the district court's determination that a petition raising the identical grounds raised in the petition whose dismissal is now sought to be appealed constituted writ abuse. See Woodard v. Hutchins, --- U.S. ----, 104 S.Ct. 752, 78 L.Ed.2d 541 (1984). The Supreme Court's majority opinion noted that although there was no "affirmative evidence" that Hutchins's constitutional claims were "deliberately withheld," "no explanation (was) made as to why they were not raised until the very eve of the execution date." See id. at ---- & n. 3, 104 S.Ct. at 753 & n. 3. Arguably, therefore, confronted with a record containing such "affirmative evidence," the Court might have reached a contrary result. While this may be debatable, I assume, as did the district court, that this limited opening for further pursuit of the writ survived the Court's vacation of the earlier stay.
 
 
 39
 In any event, by virtue of N.C.Gen.Stat. Section 15-194, and the action of the North Carolina Supreme Court implementing that statute, petitioner's execution was again stayed, thereby affording him an opportunity upon refiling his petition (whether a "new" or the "same" one is of no consequence) to supply the affirmative evidence that was absent from the previous record, namely evidence that he did not deliberately withhold the constitutional claims raised in his second petition. Counsel for petitioner then filed with the renewed petition an affidavit from petitioner's former counsel in an effort to discharge petitioner's burden of demonstrating that the claims he presented in the successive petition had not been deliberately withheld. See Price v. Johnston, 334 U.S. 266, 292, 68 S.Ct. 1049, 1063, 92 L.Ed. 1356 (1948) (once issue of writ abuse raised, petitioner has the burden of proving by a preponderance of the evidence that he has not abused the writ); Jones v. Estelle, 722 F.2d 159, 164 (5th Cir.1983) (en banc).
 
 
 40
 The district judge, on resubmission of the petition, considered the expanded record, found that the claims presented had been deliberately withheld and, based on the latter determination, concluded "that the filing of the present petition in this Court ... constitutes an abuse of the writ." Hutchins v. Woodard, SH-C-84-26 (W.D.N.C. Feb. 17, 1984) (slip op. at 8-9). After dismissing the writ, the district court concluded that the likelihood of this court's reversal of its decision was not sufficient to justify the issuance of a certificate of probable cause and denied it.
 
 
 41
 The first question on this appeal is therefore whether the district court erred in its determination that the refiling of the petition constituted an abuse of the writ. Our standard for review of that determination is well-established:
 
 
 42
 The principles governing ... justifications for denial of a hearing on a successive application (of a habeas petition) are addressed to the sound discretion of the federal trial judges. Theirs is the major responsibility for the just and sound administration of the federal collateral remedies, and theirs must be the judgment as to whether a second or successive application shall be denied without consideration of the merits.
 
 
 43
 Sanders v. United States, 373 U.S. 1, 18, 83 S.Ct. 1068, 1078, 10 L.Ed.2d 148 (1963). See also Stephens v. Kemp, --- U.S. ----, 104 S.Ct. 562, 78 L.Ed.2d 370 (1983) (Powell, J., dissenting from granting of stay of execution); Jones v. Estelle, 722 F.2d at 165. Thus, the threshold question, the substantiality of which we must consider in determining whether to issue a certificate of probable cause, is narrowly whether the district court abused its discretion in finding writ abuse under the circumstances revealed. See Stephens v. Kemp, --- U.S. at ----, 104 S.Ct. at 563 (Powell, J., dissenting).
 
 
 44
 In order to decide whether the requisite substantiality exists to justify the issuance of a certificate of probable cause, see generally Barefoot v. Estelle, --- U.S. ----, 103 S.Ct. 3383, 3394, 77 L.Ed.2d 1090 (1983), we must of course give "weighty consideration" to the fact that a district judge has denied a prior application, see Nowakowski v. Maroney, 386 U.S. 542, 543, 87 S.Ct. 1197, 1198, 18 L.Ed.2d 282 (1967), though we may take into account in making that determination that this is a capital case. See Barefoot, 103 S.Ct. at 3394 ("nature of the penalty is a proper consideration in determining whether to issue a certificate of probable cause").
 
 
 45
 With this standard in mind, it cannot be said that petitioner has made a "substantial showing," see id., that the trial court abused its discretion when it determined that the successive habeas petition constituted writ abuse because of petitioner's failure to justify the earlier withholding of the grounds now belatedly sought to be raised. Judge Murnaghan's opinion sufficiently documents the basis upon which that determination by the district court is unassailable under our standard of review.
 
 II.
 
 46
 That technical writ abuse has been properly determined by the district court does not end the matter, however. Habeas corpus proceedings are ultimately governed by equitable principles. See Sanders, 373 U.S. at 17, 83 S.Ct. at 1078. A determination that a particular successive petition constitutes writ abuse is an equitable one and, as the state concedes here, the "ends of justice" may yet require that, notwithstanding technical abuse, a constitutional claim be heard on its merits if sufficiently compelling circumstances appear. See id. at 18, 83 S.Ct. at 1078 (if the "ends of justice demand," a district judge has the power and the duty to reach the merits of the claims raised in an otherwise abusive petition).
 
 
 47
 The most difficult aspect of this case relates to this possibility. Urged as a sufficiently compelling circumstance to justify disregard of technical writ abuse here is the possibility that there may now be emerging a heretofore unrecognized constitutional principle, which might, if established, invalidate Hutchins's conviction, namely, that the practice of excluding from the guilt-phase proceedings jurors who are unalterably opposed to capital punishment is fundamentally unfair to a defendant charged with a capital crime. Stated simply and starkly, the question is whether equity requires a stay of Hutchins's execution simply to protect against the possibility that the constitutional principle now in litigation will in time, but too late to benefit Hutchins, become the law. Cf. Stephens v. Kemp, --- U.S. at ----, 104 S.Ct. at 563 (reversing court of appeals and granting stay of petitioner's execution pending decision by en banc court of appeals in a case raising substantially the same issue).
 
 
 48
 The mere fact--theoretically present to some extent in every death sentence case--that some change in extant law may occur that could compel invalidation of the conviction of a petitioner awaiting execution obviously does not suffice generally as an equitable consideration warranting stay of execution to allow merits consideration. The question is whether that general possibility is sufficiently more concrete here to invoke equitable protection. My conclusion is that on any practical assessment of the realities of the situation, it is not.
 
 
 49
 One district court in this circuit, based on the evidentiary record before it, has already rejected the Witherspoon claim sought now to be presented belatedly by Hutchins. See Barfield v. Harris, 540 F.Supp. 451, 463-64 (E.D.N.C.1982). On appeal, this court has expressly affirmed that district court decision. See Barfield v. Harris, 719 F.2d 58, 63 (4th Cir.1983) (affirming "for the reasons stated by the district judge"). Our decision in Barfield constitutes extant circuit law on the point, though concededly that decision, like all decisions, is potentially limited by its factual record.
 
 
 50
 Following this court's opinion in Barfield, another district court in this circuit concluded on a quite different and more expansive evidentiary record that sociological data demonstrates the fundamental unfairness of excluding from guilt-phase proceedings all potential jurors opposed to capital punishment in all circumstances. See Keeten v. Garrison, 578 F.Supp. 1164 (W.D.N.C.1984). That decision is now on appeal to this court. Moreover, the petitioner in Barfield, we are advised by counsel, has now sought leave to file in the Supreme Court a petition for certiorari out of time; but it is not known at this point whether Barfield will raise the Witherspoon issue in any certiorari petition that may be filed in that case.
 
 
 51
 I do not believe that we need nor that we should address the merits of the jury-selection principle adopted by the district court in Keeten in order to assess in this case whether Hutchins's execution should be stayed on equitable grounds to abide further developments in that case or possibly in Barfield. Two considerations compel for me the conclusion that the possibility that Hutchins will ever gain more than temporary respite from execution by reason of the authoritative adoption of the Keeten principle is too ephemeral to justify invocation of the ultimate equitable protection he seeks.
 
 
 52
 The first is that five justices of the Supreme Court, aware of the district court decision in Keeten and of the parallel decision in Grigsby v. Mabry, 569 F.Supp. 1273 (E.D.Ark.1983) (appeal docketed), have, in vacating my earlier stay of execution, indicated that the pendency of those decisions did not warrant this equitable relief. Nothing of which I am aware has transpired in the interval to suggest that this would not remain the view of a majority of the Court. The second consideration is one properly developed in Judge Murnaghan's opinion concerning the further possibility that the Keeten principle, even if ultimately adopted as the constitutional law of the land, whether in Barfield, Grigsby, Keeten, or Hutchins itself, would result in more than a temporary respite from the death sentence imposed upon Hutchins by North Carolina, given the undisputed, and apparently indisputable evidence of his commission of the criminal acts for which he was convicted. While such a consideration of course has nothing to do with vindication of the principle itself, it must have a great deal to do with assessing the equities of Hutchins's request for a stay of execution because of possible emergence of that principle.
 
 
 53
 Because of North Carolina's automatic resentencing-upon-stay law, it is not possible for us to follow the course recently followed by the Eleventh Circuit of granting a stay of limited duration specifically to permit final Supreme Court review of our ruling. See Antone v. Dugger, --- U.S. ----, 104 S.Ct. 962, 79 L.Ed.2d 147 (1984). Fortunately, even within the North Carolina scheme, there remains time before the scheduled execution for such review to be sought. An opportunity thus remains to test whether we have misinterpreted, to Hutchins's detriment, the implications of the Supreme Court's vacation of my earlier stay.
 
 
 54
 I concur in the decision to deny the certificate of probable cause to appeal and the motion to stay execution.
 
 SPROUSE, Circuit Judge, concurring:
 
 55
 I concur.
 
 
 56
 As I view what my colleagues have written, they are not in disagreement, and I do not disagree with the several major points they have so well treated. I believe it is a mistake, however, to consider the merits of the underlying constitutional claim. I would limit this opinion and hold simply that the district court did not abuse its discretion in dismissing the second petition for writ of habeas corpus.
 
 
 57
 We are not considering an appeal on the merits, but an application for a certificate of probable cause to appeal from the district court's ruling that Hutchins's second petition constitutes an abuse of the writ. The issue is not whether he made a substantial showing that he was denied a federal right at the habeas corpus hearing, but whether the district court abused its discretion in holding that Hutchins had deliberately failed to present his constitutional claim in his first petition. Under the circumstances of this case, the district court's holding, in my view, was virtually required by the Supreme Court's holding in Woodard v. Hutchins, --- U.S. ----, ----, 104 S.Ct. 752, 753, 78 L.Ed.2d 541, 543 (1984) (Hutchins II ). Although the Supreme Court there considered and granted North Carolina's application to vacate Judge Phillips's stay of execution, it discussed the habeas corpus petition on which the stay was founded and described it as "a clear example of the abuse of the writ that Sec. 2254(b) was intended to eliminate." Id. --- U.S. at ----, 104 S.Ct. at 753, 78 L.Ed.2d at 544. Although the Supreme Court was probably not obliged to reach that issue in the context of a stay proceeding, its unqualified statement that Hutchins's second petition represented "a clear example of the abuse of the writ" cannot be ignored by lower federal courts considering the identical question. Keeten was not a new development. It had been pending in Judge McMillan's court for two years, and the decision was issued the day before the Supreme Court considered Hutchins II. In these circumstances, it cannot be said that the district court abused its discretion.
 
 
 
 [1]
 The statute of North Carolina calls for the same jury to decide, in a case involving first degree murder, both a) guilt or innocence and, if guilt is found, b) what the sentence should be. See North Carolina General Statutes Sec. 15A-2000
 
 
 [2]
 See Sanders v. United States, 373 U.S. 1, 18-19, 83 S.Ct. 1068, 1078-1079, 10 L.Ed.2d 148 (1963)
 Furthermore, a certificate of probable cause pursuant to 28 U.S.C. Sec. 2253 had been sought (on March 5, 1984) and denied (on March 7, 1984). It followed the dismissal ordered on February 17, 1984 by Judge Woodrow W. Jones in a suit initiated by a petition for a writ of habeas corpus filed on January 12, 1984 in the United States District Court for the Western District of North Carolina, and asserting the same grounds as those raised in the January 11, 1984 state motion for appropriate relief. The dismissal was predicated on the grounds that the petition was successive and an abuse of the writ. See 28 U.S.C. Sec. 2244(b); Rules Governing Section 2254 Cases in the United States District Courts Rule 9(b).
 
 
 [3]
 No question remains as to whether, in fact, Hutchins committed the crimes. The record leaves no room for doubt on that score. The case is, consequently, solely one attacking the method of conviction, not its accuracy
 
 
 [4]
 A new execution date of March 16, 1984 has been fixed by the Superior Court of Polk County, North Carolina
 
 
 [5]
 See State v. Spaulding, 298 N.C. 149, 257 S.E.2d 391 (1979); State v. Cherry, 298 N.C. 86, 257 S.E.2d 551 (1979)
 
 
 [6]
 Those cases had been pending for approximately two years prior to January, 1984. Argument based on the sociological data took place on September 23, 1983 in Keeten
 
 
 [7]
 A principal reason advanced by Judge Dupree for not delaying, despite the defendant's request, ruling in order to permit Keeten et al. to be decided and appealed to this Court was that the Fourth Circuit, having before it Barfield v. Harris and the Keeten cases, should rule on the claim that there should be a new development in the law of capital crimes. See 540 F.Supp. at 464 n. 6
 
 
 [8]
 Of the four individuals involved in Keeten, all save one were serving life sentences. Only Williams was under a sentence of death. However, Williams was relieved of the sword of Damocles in the form of the death sentence as a consequence of the Keeten decision entered by Judge McMillan on January 12, 1984, the Williams case being one of the four consolidated cases making up Keeten. Accordingly, unless and until the Fourth Circuit acts to reverse that portion of the decision in Keeten, which it will do only after due consideration of arguments based on the sociological data presented in Keeten, Williams is not under sentence of death
 
 
 [9]
 The consolidated cases comprising Keeten have been appealed by the State of North Carolina, providing us with ready access to the sociological study material in the Keeten case record on which Judge McMillan's opinion rests
 
 
 [10]
 In Witherspoon v. Illinois, 391 U.S. 510, 517-18, 88 S.Ct. 1770, 1774-75, 20 L.Ed.2d 776 (1968), the court dealt with exclusion of potential jurors merely on the basis of conscientious scruples against the death penalty, something far less than the fixed and unalterable opposition here present. In a bifurcated trial, the resulting jury was deemed not unrepresentative on the issue of guilt or a body for which the risk of conviction was substantially increased. The flaw related only to the sentence aspect
 In the present case, no one argues that jurors unalterably opposed to the death penalty may not be disqualified for cause at the sentencing stage. As Judge McMillan in Keeten observed, "[p]ersons conscientiously objecting to the death penalty may validly be excluded from the second phase, or punishment phase of the trial." He further observed that "[p]etitioners concede that the state may constitutionally exclude persons unwilling to impose the death penalty from the penalty determination phase of a criminal trial." To hold otherwise would be the equivalent of inviting both the flat disregard of a juror's duty and the effective frustration of the right which the state has, in a proper case, to seek the death penalty. See State v. Pinch, 306 N.C. 1, 9-10, 292 S.E.2d 203, 213, cert. denied, --- U.S. ----, 103 S.Ct. 474, 74 L.Ed.2d 622 (1982), reh'g denied, --- U.S. ----, 103 S.Ct. 839, 74 L.Ed.2d 1031 (1983):
 It would have amounted to an absurdity and a mockery of our law to have permitted these jurors to sit on a case where imposition of the death penalty was an available sentencing option. For, if capital cases could be tried by juries which included persons firmly opposed to the maximum prescribed penalty sought by the State, the separate sentencing hearing mandated by G.S. 15A-2000 would almost certainly become a futile and meaningless exercise, contrary to the expressed will of our citizenry in the enactment of capital punishment legislation.
 (Emphasis in original).
 Indeed, that consideration supplies the answer as to why Hutchins has no reasonable chance of success. Only the sentencing aspect, not the guilt aspect, of the jury's function should now properly be addressed in his case, for it certainly amounts to the law of the case that the issue of guilt or innocence is no longer open for consideration. In his January 13, 1984 opinion for a majority of the Supreme Court, Justice Powell observed: "It is not denied that he deliberately murdered three policemen." --- U.S. ----, 104 S.Ct. 752, 78 L.Ed.2d 541. The state concededly may strike for cause from any jury array, chosen to consider sentencing, all potential jurors adamantly unwilling to vote for imposition of the death penalty. That is all that we have here: an admittedly proper jury to determine sentence.
 Even assuming that a separate jury from which potential jurors inflexibly opposed to a death sentence had not been removed for that reason should be required to ascertain guilt or innocence, nevertheless that jury, in Hutchins' case, would have no substantial role to play. Guilt has been incontrovertibly established. As Judge McMillan has observed in Keeten, the data which led him to his conclusion is "most significant in close cases--ones in which the evidence can be interpreted either way." Hutchins simply does not present a close case on the issue of guilt.
 To put things another way, the best result for which Hutchins could hope, on a federal constitutional basis, would be a retrial on the issue of guilt or innocence. The sentencing verdict would in any event be free from defect. It would be a wholly useless exercise to retry guilt, which is not properly an issue, only to find the sentence of death inexorably still outstanding, once that retrial was completed.
 That is not to say that, if the jury selected to determine guilt or innocence were indisputably improperly constituted, Hutchins would, nevertheless, not be entitled to a new trial. But that is not the situation. It is unlikely, or at best altogether uncertain, that the Grigsby/Keeten point would prevail. In that posture, especially given all the other considerations we have outlined, it is inappropriate to certify that Hutchins has probable cause to pursue the attempted appeal.
 
 
 [11]
 The state has a "legitimate interest in obtaining jurors who could follow their instructions and obey their oaths." It is constitutionally permissible to exclude prospective jurors unable or unwilling to address impartially the penalty questions. Adams v. Texas, 448 U.S. 38, 44, 46, 100 S.Ct. 2521, 2526, 2527, 65 L.Ed.2d 581 (1980)
 
 
 *
 In his second habeas petition, as now resubmitted, Hutchins raised two claims in addition to the Witherspoon issue: (1) that new psychiatric evidence demonstrated that Hutchins was insane at the time he committed the crimes of which he was convicted; and (2) that the Eighth Amendment prevented Hutchins's execution because evidence revealed that Hutchins was presently insane. Having considered the briefs of the parties and the arguments of counsel on these points, we conclude that petitioner has not shown the requisite likelihood that he will prevail on an appeal from the district court's decision dismissing the petition raising these claims, and we discuss them no further